**Opinion issued April 2, 2020**



In The

# Court of Appeals

### For The

## First District of Texas

———————————

### NO. 01-19-00888-CV

———————————

## IN THE INTEREST OF A. L., T. L. S. AND T. S., Minor Children

---

### On Appeal from the 246th District Court
### Harris County, Texas
### Trial Court Case No. 2016-72719

---

## MEMORANDUM OPINION

This is an appeal in a parental termination case. The trial court found that the mother endangered her two youngest sons, *see* TEX. FAM. CODE § 161.001(b)(1)(E), and that she failed to comply with the provisions of a court order without proof of a statutory defense. *See id.* § 161.001(b)(O). The court further found that termination of her parental rights to her sons was in their best interest. The trial court did not

terminate the mother's parental rights to her teenage daughter, but it found that it was in the best interest of the daughter to appoint the Department of Family and Protective Services ("the Department") as the sole managing conservator and the mother as the sole possessory conservator.

On appeal, the mother challenges the factual sufficiency of the evidence to support the best-interest finding as to her two youngest sons and the trial court's exercise of discretion in appointing the Department sole managing conservator.

We affirm.

## Background

Appellant is the mother of five children: Amy (16), Andy (9), Cam (8), Jason (7), and Joey (3).[1] Andy and Cam were placed with their paternal relatives, and they are not the subject of this appeal.[2]

In September 2016, when appellant was nine months' pregnant with Joey, the Department received a referral alleging that she had been physically abusive to her

---

[1]    These are fictitious names, which we use to protect the anonymity of the children, for ease of writing, and because of the similarity of the younger two children's names. Both the mother and the Department referred to the daughter, A.L., as Amy. In her brief, the mother referred to T.L.S. as Tim and T.S. as Tom. In its brief, the Department reversed this, referring to T.L.S. as Tom and T.S. as Tim. To avoid the confusion created by the parties' naming of the youngest sons, we refer to the older son involved in this case as Jason, and the younger son involved in this case as Joey.

[2]    The mother's parental rights to Andy and Cam were not terminated; she is their possessory conservatory with visitation rights in accordance with a standard possession order and based up on agreement with each son's managing conservator.

children and had been using illegal drugs. The Department investigated, and the mother submitted to a drug test, which was positive for cocaine. The mother voluntarily placed her children with a friend, who kept them for several weeks, until they were each placed with family friends or relatives. After threatening to flee with her children, the mother picked them up from school unsupervised. This violated her agreement with the Department. In October 2016, weeks after Joey was born, the Department became the temporary managing conservator of the children.

When the children were removed, the mother was living in an apartment at Cuney Homes, paying subsidized rent of $50 per month. The trial court permitted her to keep custody of the newborn. Amy, who was 12 years old at the time, remained with a family friend, and Jason, who was 3 years old, was placed with Cam, who was 4 years old, with Cam's biological father.

In January and February 2017, the mother tested positive for cocaine, indicating that she had used cocaine in the three days before the test. Hair follicle testing in January 2017 also showed that the mother had used cocaine in the 90 days before that sample was taken. Because of the positive drug tests, in February 2017, the Department removed Joey from his mother's care. He was cared for in baby group homes until he was placed with the foster parents who want to adopt him.

The trial court ordered the mother to comply with the terms of a family service plan prepared by the Department and intended to address the reasons why the

children came into care. The family service plan required the mother to take a parenting class, undergo substance abuse assessment and counseling, submit to drug testing, maintain sobriety, attend visitation with her children, maintain safe and stable housing, maintain employment, and demonstrate an ability to nurture and protect her children.

In March 2017, the mother was evicted from her apartment at Cuney Homes for nonpayment of rent. She later testified that she could no longer afford to pay rent once Cam's father stopped paying child support because Cam had been placed with him. The mother lived in several other places, and for a period she was homeless. The mother did not allow the Department to visit any of the places she lived since Cuney Homes. At trial, the mother said that she did not ask the caseworker to see any of her residences because she had stayed with several other people and she knew they did not have the room for her children. At trial, she said she was living with her boyfriend, Sidney Harrison.

The mother took a parenting class, completed psychological, psychosocial, and substance abuse assessments, and she participated in some individual counseling. But she did not complete the services required by the Department and the family service plan. In particular, she did not complete individual therapy, substance abuse classes, and a drug treatment plan. The mother testified that the counseling sessions were expensive—between $100 and $200 per hour—and she

could not afford to pay. Keverlyn Walker, the Department's casework assigned to this case, testified that the Department paid for the services until the mother was unsuccessfully discharged due to failure to participate. After the mother was unsuccessfully discharged from several services, Walker informed her that she would be financially responsible for completing her services, and Walker informed the mother of several providers that offered the required services at no charge. Walker testified that the mother's estimated costs were based on her selection of providers.

The mother submitted to some drug tests, and she refused to submit to others, despite having been told that a refusal to cooperate would be considered a positive result for illegal drugs. At trial, the mother testified that sometimes she was unable to get to the laboratory for testing due to lack of transportation or because she was working. She explained that without a car, the bus ride to the downtown location took about two hours and sometimes she could not afford the bus fare. The mother also said that her identification card expired in 2018, and due to her difficulty maintaining housing and employment, she had additional difficulty renewing her identification. She also testified that she could not complete drug testing without identification. Walker, however, testified that on several occasions she offered to drive the mother to and from the drug testing laboratory and to vouch for her identity, but the mother did not accept.

5

Bruce Jefferies, who works for the National Screening Centers, testified as an expert in drug testing results and analysis. He testified about each drug test the mother took and interpreted the results. According to Jefferies, a positive result on a urinalysis meant that the mother used cocaine within three days preceding the date the sample was collected. A positive result on a hair follicle test meant that the mother used cocaine in the 90 days preceding the date the sample was collected.

According to the test results and Jefferies's testimony, the mother used cocaine in the three days preceding the following dates: 1/24/17; 2/2/17; 2/28/17; 6/12/17; and 4/17/18. She also used cocaine in the 90 days preceding these dates: 10/21/16; 1/25/17; 2/2/17;5/4/17; 8/21/17; and 10/19/17. She tested positive for the use of opiates within three days of a sample taken in May 2017. She tested negative for the use of illegal drugs within three days of samples taken on these dates: 10/20/16, 12/1/16; 6/2/17; 7/28/17; 8/21/17; 9/8/17; 10/5/17; 10/19/17; and 6/19/18.

The mother refused to take or failed to appear for drug tests in March and April 2017. In June 2017 and June 2018, she refused hair follicle testing; once she said that the laboratory was taking too much hair. The mother refused to take or missed nine drug tests between November 2017 and April 2018, and she again refused or missed five drug tests from August 2018 to December 2018. She refused or missed another drug test on March 21, 2019. In June 2019, the mother tested positive for marijuana, amphetamines, and methamphetamines.

At trial, the mother testified that she "completed all services except for—I needed, like, six units of counseling, and I did like the substance abuse assessment, like, three times, three or four times already, so—." The mother asserted that she missed two drug tests, saying that she had not received the voicemail message because she was at work.

The mother remembered signing two family service plans, but she claimed that she "had no idea" that her parental rights could be terminated if she did not complete the services or the recommendations of the family service plan. Although she testified that she did not read the plans, she also testified that she understood the family service plans to be "a list of requirements by the Department in order for me to get my kids back."

The mother denied having used cocaine any time after November 11, 2003, but she admitted that she had used drugs "every now and then" after her children were born. She said that she "dibbled and dabbled a little," but she maintained that she did not use drugs "anywhere near my children." The mother conceded that she had missed more than one random drug screening. She testified that she had difficulty with transportation to drug tests, but she admitted that she did not ask the Department to find a closer drug testing location. Once, when Walker offered to drive her to the drug test, take her home, and vouch for her when she lacked a valid

identification, the mother declined because she "had some other pressing matters" to deal with, including work.

The mother worked part-time for People Ready, a temporary staffing company, from April or May 2017 until October 2018. She did not provide a year's worth of paycheck stubs to Walker or anyone else in the Department. At trial, she testified that while the case was pending, she also worked for Walmart, Texas Southern University, Café Express, and GES Services. She also testified that she had an offer to do office work for Warrior Electric. She did not provide the Department with proof of employment with these employers while the case was pending, nor did she testify at trial about how much she earned or how consistently she worked. She testified that she could not provide paycheck stubs because she lost all her paperwork. She did not provide financial support to her children during the case, except to buy a small present occasionally or give the children a few dollars when she saw them. The mother testified that the Department had refused to help her, but both the caseworker and the Child Advocate testified that they gave her financial assistance in the form of grocery gift cards and bus passes, as well as nonmonetary assistance and encouragement.

The mother described her relationship with her children as "very loving," and "close." She called herself "a very active parent at the school," and she said that she was there often. She said that she and the children "have fun" during visits and that

they play, talk, and laugh. But Walker, the Child Advocate, the boys' foster parents, and Amy's foster mother all testified that the mother's inconsistency in attending visitation had negatively impacted the children. For example, Amy's foster mother reported that she would hear Amy crying when her mother failed to show up; Jason's foster parents noted that he became clingy or engaged in negative attention-seeking behaviors when the mother cancelled a planned visit. Judy Ruhlin, the Child Advocate, testified that she observed family visits in which the mother ignored the children to use her phone and failed to observe and supervise them. For example, at one visit, Jason and Cam ran through the halls while the mother made phone calls. Ruhlin also noted that while the mother played well with Joey, she corrected Jason frequently and ignored him when he behaved appropriately. Ruhlin described the mother's interaction with Amy as practically nonexistent, and she noted that Amy often did not want to come to visits with her mother.

Jason and Joey's foster father testified that he had twenty years of experience in education, including eight years teaching English and Special Education and twelve years as a college football coach. He testified about the routine that he and his wife created for Jason and how their use of consistency, positive reinforcement, and structure have reduced Jason's negative attention-seeking behaviors. He talked about the activities he engages in with both Jason and Joey, and he said that he loves them and wants to adopt them. He testified that he and his wife chose sports activities

for Jason that would not interfere with his mother's visitation schedule, noting the genuine bond between the mother and Jason and that Jason misses his mother. He also said, however, that the mother's frequent last-minute cancellations of visitation had an adverse effect on Jason. The foster father noted that Joey was just beginning to understand what was happening.

The boys' foster mother, who was pregnant at the time of trial, testified that she worked as an administrative assistant at a high school. She said the boys came to them in September 2017. She noted that Jason arrived with negative attention-seeking behaviors, like being noisy, disruptive, and running around. She said that Jason's behavior improved with play therapy and consistency in the home. She said that she acknowledged him, let him know that she loved him, gave him positive attention, played with him, and read to him. She also said that Joey, who was almost three years old, was thriving, was advanced for his age, and enjoyed sports. The foster mother said that Jason became nervous before visits because he never knew what to expect. Sometimes they waited in the car outside of the Department's office for up to an hour for the mother to arrive. Because the children would be disappointed by last minute cancellations, the foster mother planned fun family activities as alternatives if the visitation did not take place. She said Joey, who had spent most of his early life in baby group homes, would have difficulty transitioning to a new home, and she said that she thought both boys would adjust if visits with

the mother were permanently discontinued. She testified that she wants to adopt the boys.

Amy's foster mother testified that she works two jobs, one of which she has held for 26 years. She said that she would like to adopt Amy or provide a long-term placement for her. She described Amy as "a normal teenager with a lot of baggage." She said that Amy was hurt when her mother missed visits, describing Amy as "heartbroken" and "very sad." The foster mother testified that she has an adopted five-year-old daughter and a three-year-old foster daughter who live in the house with them. She also has a large extended family, including children, grandchildren, and cousins, who spend time together. She noted that six of those relatives were present in court that day to provide support for Amy.

Amy's foster mother talked about the challenges Amy had experienced in addition to her sadness and disappointment. She said that Amy fought with other girls at school and had both engaged in and been victimized by bullying, including online bullying. The foster mother noted that Amy had twice been temporarily placed in an alternative school due to the fighting. The foster mother noted that in one such instance Amy was the victim, but the school chose to discipline all the children who were involved. The foster mother testified that she is frequently at Amy's school, she knows who bullied Amy, and she met with their parents about it.

11

Amy's foster mother testified that she talks to Amy when her behavior falls short, and she imposes consequences such as taking away the privilege of using a cell phone or participating in fun outside activities. She testified that she periodically monitors Amy's cell phone and imposes consequences when she finds inappropriate content, such as photographs of boys who are too old for Amy.

The foster mother testified about an incident that happened when Amy was 15 years old. Amy let her boyfriend in to the foster mother's house when everyone was asleep. The foster mother learned about this later when she overheard Amy telling someone that she had sex with her boyfriend that night. The foster mother impressed upon her that this behavior was unacceptable particularly because other foster children reside in the house. She also called the caseworker and took Amy to the doctor.[3] She also changed the locks and testified that she was in the process of installing cameras.

Amy's foster mother testified that Amy was an A/B student who likes math and wants to be a lawyer, and she said she was committed to helping Amy accomplish her goals. She encouraged Amy to attend visitation to maintain a connection with her mother and brothers. She said that Amy loves the three-year-old and the five-year-old girls who live with them, and she refers to them as her sisters.

---

[3] The caseworker testified that when she told the mother what had happened, she referred to her daughter as a "ho" and requested that Amy not attend the next visitation.

The foster mother said that Amy does not babysit for the little girls, noting that Amy is "my baby herself." She said that Amy was safe and secure in her home and that she had promised Amy that she would adopt her if that was what Amy wanted.

The caseworker and the Child Advocate both opined that termination of the mother's parental rights was in the best interest of the children because she had not demonstrated an ability to provide the children with a safe and stable environment, she had not achieved or maintained a drug-free life, and she had not addressed her substance abuse issues. The mother said it was not in her children's best interest to terminate her rights, specifically noting that she was the only mother Amy knew. The mother said she would "never believe" that her children's needs for consistency, routine, structure, or trust were being met in foster care. The mother was asked if she understood what might happen if her parental rights were not terminated:

> Q.  Do you understand you could potentially be named as a possessory conservator in this suit if this Court is so inclined?
>
> A.  Okay. That's fine, yes.

After a bench trial, the court terminated the mother's parental rights to Jason and Joey, and though it did not terminate her parental rights to Amy, it appointed the Department as sole managing conservator and appointed the mother as possessory conservator. The mother appealed.

## Analysis

### I. Sufficiency of the evidence

The mother concedes the predicate act findings and the legal sufficiency of the evidence to support the trial court's finding that termination of her rights was in the best interest of her two youngest sons. In her first issue, she challenges only the factual sufficiency of the court's finding that termination of her parental rights to Jason and Joey was in their best interest.

## A.     Standards of review

The interest of parents in the care, custody, and control of their children is a fundamental liberty interest protected by the Constitution. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). But the rights of natural parents are not absolute. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Protection of the child is paramount, and when the State institutes proceedings to terminate parental rights, courts focus on protecting the best interests of the child. *See id.*

"A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We strictly scrutinize termination proceedings on appeal because "the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky*, 455 U.S. at 747–48); *see In re J.F.C.*, 96 S.W.3d 256, 263–

14

64 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

In a factual sufficiency review, the reviewing court determines "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). We do not disregard disputed evidence that the factfinder could have disbelieved; rather, we consider whether "a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*; *see In re A.R.R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *3– 4 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.).

A court may order termination of the parent-child relationship when it finds by clear and convincing evidence that the parent has committed one or more of the statutorily enumerated predicate acts or omissions, and that termination is in the children's best interests. TEX. FAM. CODE § 161.001(b)(1), (2). "Only one predicate finding" under section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best

interest." *A.V.*, 113 S.W.3d at 362; *see In re A.H.L.*, No. 01-16-00784-CV, 2017 WL 1149222, at \*3 (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, pet. denied) (mem. op.).

The "best interest" finding is a separate inquiry from the finding of a predicate act, but evidence that supports a predicate-act finding may also be probative of the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(2); *A.R.R.*, 2018 WL 3233334, at \*4. Our review of a trial court's best interest finding is guided by the following non-exclusive factors: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *A.R.R.*, 2018 WL 3233334, at \*4.

**B.** **The evidence is factually sufficient to support the trial court's finding that termination of the mother's parental rights was in the best interest of the children.**

*Desires of the children.* Jason and Joey were seven and three years old, respectively, at the time of trial, and no evidence indicates that either expressed any desire about termination of their mother's parental rights. This factor is neutral.

*The emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, and the stability of the home or proposed placement.* No evidence indicated that either Jason or Joey had any special emotional or physical needs. However, the evidence showed that the mother had not demonstrated an ability to meet the children's basic needs, such as providing a safe and stable home for the children. She moved multiple times during the case, and she did not permit the Department to see her homes because she knew that they could not accommodate her children. She testified that she had worked for multiple employers, but she did not provide evidence verifying her employment to the Department. She frequently missed visitation with the children, and multiple witnesses testified at trial that her frequent and unpredictable absences from her children's lives caused them emotional harm. Although the mother completed a parenting class—and testified that she learned how to communicate with her

17

children—she did not demonstrate these skills during visitations in which she sometimes ignored her children or scolded Jason.

To the contrary, the foster parents demonstrated an ability to nurture the children and provide them with structure and consistency. They engaged with the children in positive ways that enabled Jason to grow beyond his negative attention-seeking behaviors. They demonstrated stability in their professional roles as well as in their family life. This factor weighs strongly in favor of the trial court's decree.

***The programs available to assist these individuals to promote the best interest of the child.*** Walker testified that if the mother's parental rights to the boys were not terminated, the Department would again offer services to the mother to help address the reasons why the children came into care. However, she noted that the mother had already been offered these services, free of cost, and she had failed to participate. This factor does not weigh against the trial court's decree.

***The plans for the child by these individuals or by the agency seeking custody.*** The mother did not testify about any plans for her children, despite the sincerity of her expressions of love for them. The foster parents testified that they loved the boys and wanted to adopt them. This weighs in favor of the trial court's decree.

***The acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and any excuse for the acts or omissions of the***

*parent.* Three areas indicate that the existing parent-child relationship is not proper. First, the mother failed to address her substance abuse problem and continued to use cocaine and other illegal substances at a time when she knew her parental rights were in jeopardy. Second, she failed to comply with the provisions of a court order that established the actions necessary to obtain return of her children. At trial she offered excuses for her lack of follow-through, including lack of financial resources and transportation. But other testimony indicated that she declined offers for help with transportation and failed to avail herself of services when they were provided to her at no charge. Third, the mother's frequent and unpredictable absences from visitation caused her children emotional harm. This factor weighs in favor of the trial court's decree.

\* \* \*

Much of the evidence was undisputed. The evidence that did not support the trial court's decree consisted of the mother's testimony. For example, she denied using cocaine since her children were born. Her testimony regarding her drug use, however, was inconsistent. She admitted at trial that she "dibbled and dabbled" with drugs, i.e., used cocaine after her children were born. She also testified that, in her opinion, termination of her parental rights was not in the best interest of the children. The trial court as factfinder could have assessed the mother's credibility against her, and thus it could have disregarded the parts of her testimony that conflicted with the

19

other evidence in this case. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("[T]he factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor.").

We conclude that that the disputed evidence regarding the mother's drug use—i.e., the mother's denial of drug use—was not so significant that it would have prevented the trial court from reasonably forming a firm belief or conviction that termination of the mother's parental rights is in the best interest of the children. *See J.F.C.*, 96 S.W.3d at 266. We overrule the mother's first issue.

## II.    The trial court did not abuse its discretion by appointing the Department sole managing conservator of Amy.

In her second issue the mother argues that the court abused its discretion by appointing the Department as Amy's sole managing conservator. Under our abuse-of-discretion standard, we will reverse a trial court's appointment of a nonparent as sole managing conservator only if we determine that it is arbitrary or unreasonable or without evidentiary support. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re R.L.*, No. 01-16-00851-CV, 2017 WL 1496955, at *12 (Tex. App.—Houston [1st Dist.] Apr. 21, 2017, no pet.). A trial court does not abuse its discretion if it bases its decision on conflicting evidence, so long as some evidence of a substantive and probative character supports its decision. *See Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

The primary consideration in determining issues of conservatorship and possession of and access to a child is always the child's best interest. *See* TEX. FAM. CODE § 153.002; *J.A.J.*, 243 S.W.3d at 616. "A managing conservator must be a parent, a competent adult, the Department of Family and Protective Services, or a licensed child-placing agency." TEX. FAM. CODE § 153.005(b); *see J.A.J.*, 243 S.W.3d at 614. "[U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." TEX. FAM. CODE § 153.131(a).

"The trial court may render a final order appointing the Department as managing conservator of the child without terminating the rights of the parent of the child if the court finds that: (1) appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development; and (2) it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator." *Id.* § 263.404(a). The court must consider the following factors when determining whether the Department should be appointed sole managing conservator of a child whose parent's rights have not been terminated: (1) whether the child will reach 18 years of age in not less than three years; (2)

whether the child who is 12 years old or older has expressed a strong desire against termination or being adopted; and (3) the needs and desires of the child. *Id.* § 263.404(b).

In this case, the evidence showed that appointing the mother as managing conservator of Amy would significantly impair her physical health or emotional development because the mother was unable to demonstrate that she could provide a safe and stable home and avoid the use of cocaine and other illegal substances like methamphetamine. The mother's repeated failure to visitations caused Amy emotional harm.

In addition, Walker and Ruhlin both testified to the efforts made to place Amy with a relative. They investigated more than seven potential placements including aunts, grandparents, and fictive kin in both Texas and California. Not only did they investigate relatives and family friends identified by the mother, they also investigated any names supplied by Amy. Some relatives were unable due to health or other concerns to take Amy, others were disqualified by their criminal history or prior involvement with Child Protective Services, and others were rejected because they were not biological relatives and they had no preexisting relationship with Amy.

The record indicates that Amy was nearly 16 years old at the time of trial, and that she had requested an opportunity to speak privately with the trial court judge about her wishes. The record indicates that, although Amy had made some poor

choices, her needs for support, discipline, structure, and nurturing were being met by her foster mother who wanted to continue caring for Amy as either a foster or an adoptive mother.

We conclude that the trial court did not abuse its discretion by appointing the Department as sole managing conservator because its decision was not arbitrary or unreasonable and was based on evidence. We overrule the mother's second issue.

## Conclusion

We affirm the decree of the trial court.

Peter Kelly
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Goodman.